678 A.2d 1208

COMMONWEALTH OF PENNSYLVANIA

v.

**Samuel MONROE, Appellant.**

Superior Court of Pennsylvania.

Submitted March 27, 1996.

Filed May 31, 1996.

Reargument Denied Aug. 8, 1996.

John W. Packel, Asst. Public Defender, Philadelphia, for Com.

Peter J. Gardner, Asst. Dist. Atty., Philadelphia, for appellant.

Before CAVANAUGH, TAMILIA and MONTEMURO*, JJ.

TAMILIA, Judge.

Samuel Monroe appeals from the February 22, 1995 judgment of sentence imposed following his convictions for theft by unlawful taking,[1] theft by receiving stolen property[2] and conspiracy.[3] On the theft counts, appellant was sentenced to a term of two and one-half (2–1/2) to five (5) years' imprisonment and on the conspiracy count, appellant was sentenced to a consecutive term of one (1) to two (2) years' imprisonment.

At the nonjury trial, appellant and the victim offered dramatically different accounts of the events underlying this case. Our resolution of the issue presented requires a lengthy review of these differing accounts:

.    .    .    .    .

* Retired Justice assigned to the Superior Court.

1. 18 Pa.C.S. § 3921.

2. *Id.,* § 3925.

3. *Id.,* § 903.

On March 25, 1994 at approximately 11:45 a.m. the complainant, Merari Rodriquez entered the Gallery Shopping Center, (Gallery) located at Eighth and Market Streets, in the City and County of Philadelphia. As she entered the Gallery, the complainant testified that she was approached by a male, later identified as the defendant, Samuel Monroe. It is Rodriquez's testimony that as she entered the Gallery, two men and a lady were coming toward her when the defendant grabbed her and put his arms around her shoulder and told her to keep walking, shut up, and act like she was his friend. At this point, she also felt something in her stomach but she did not know what it was. As the complainant and the defendant walked the other male and female walked alongside of them. (N.T. 12/6/94 pp. 19–22).

The complainant stated that as they exited the Gallery they walked down Market Street toward 7th Street because the defendant asked for her MAC card and told her that they were going to her bank, which was the Mellon Bank. As they walked toward the bank Rodriquez stated that she believed that the defendant had a gun. Upon entering the bank the defendant asked the complainant to enter her pin number. As he stood beside her the other male and female stood in the corner of the lobby of the bank. (N.T. 12/6/94 pp. 23–26).

Rodriquez testified that when the defendant asked for the pin number she told him that all she had was $50.00. Initially, she entered the wrong pin number because she did not want to give the defendant the $50.00. She subsequently entered the correct pin number. After giving the defendant the money they left the bank and then went to a nearby McDonald's restaurant. The complainant testified that she followed the defendant to McDonald's because she believed that he had a gun. (N.T. 12/6/94 pp. 26–29).

After entering the McDonald's they sat at a table when the defendant again asked for her MAC card. At his request, the complainant gave the defendant her MAC card. The defendant also asked the complainant for additional money she had on her person and the gold chain she was

wearing. She testified she gave Monroe $40.00 that she had in her pocket but refused to give him her gold chain. At this point she saw what she believed to be the handle of the defendant's gun, as he reached inside his clothing. (N.T. 12/6/94 pp. 30–34).

Afterwards, the defendant and his friends stood up, the defendant handed the complainant a dollar bill and told her to get herself a soda. As the complainant complied with the defendant's demand, the defendant and his friends left the restaurant. Subsequently, Rodriquez also left the Mc-Donald's and went to her job (which was just two blocks away) spoke with the bank manager and stated, she had just got robbed and mugged. The police were then called. (N.T. 12/6/94 pp. 34–35). She met with Detective Arnaldo Puenti.

Conversely, the defendant asserts that the complainant was not robbed or mugged. Instead, Monroe contends that he did approach the complainant as she entered the Gallery. However, when he approached Rodriquez he handed her a small note which read, "African Housing Church of Praises, Reverend John Doe, pay advance $200.00." The defendant testified that the purpose of the note was to scam the complainant. He explained that he told Rodriquez in an [A]frican dialect that he was from Johannesburg, South Africa, lost and had met a black male at the bus station and paid him $200 in advance to show him a place stay [sic]. As he walked around, however, he could not find any assistance. (N.T. 12/6/94 pp. 79–81).

After explaining his predicament the defendant sought the complainant's assistance. She agreed to assist the defendant. The defendant asserts that he picked the complainant because she looked gullible and wore her MAC card around her neck. The complainant indicated that she had never heard of the place for which Monroe was looking. As they stood discussing how to acquire some help, the defendant suggested that the complainant ask a Black male and female who were walking past. The couple stated that they did not know where this place was either. According

to the defendant, these two people were friends of his and part of the scam.

Suddenly, Monroe pulled out what appeared to be a large sum of money. This was actually U.S. Currency wrapped around newspaper. The couple exclaimed to him to put the money away, as did Rodriquez. The defendant then offered to pay Rodriquez and the couple $50.00 if they would give him five minutes of help. They all agreed to help. (N.T. 12/6/94 pp. 81–83).

The male recommended to the complainant that they take Monroe to the "Mother Bishop Homes," which is affiliated with the "NAACW," which helps foreigners coming into this country. They told her the Mother Bishop Homes were located between eighth and ninth on Market Street. An exchange transpired about being able to tell good people from bad people, the importance of having identification, and explaining the process of a banking institution to avoid carrying around such a large sum of money. As Monroe's male compatriot explained the banking process, Monroe asked to see a bank card, and asked the complainant to show him a bank card. She complied by pulling her card out. After an additional exchange about easing Monroe's fears of being manipulated, Rodriquez agreed that she would go to her bank and withdraw some money to show that she was honest and to further explain the banking process. As they reached her bank, Monroe said to the complainant, "I do not want you to try to deceive me as the first man did. Can you please take my finger and show me how you do the magical trick?" It's Monroe's testimony that the complainant took his fingers and pointed to the numbers. Initially, she placed the wrong number in because she was nervous. She then entered the correct pin number and got $50.00 out of her checking account. (N.T. 12/6/94 pp. 83–88, 99–100).

Monroe testified that he told Rodriquez that she should put her money in her pocketbook and then suggested that they walk to McDonald's so they could sit down. While at McDonald's, a discussion ensued about getting Monroe to

where he is trying to go and whether he had any luggage. Monroe stated that his green card and immigration papers were at the Greyhound Bus Station, however, he was afraid to return to the bus station by himself for fear of being robbed again. The male then agreed to accompany Monroe back to the bus station. Monroe then agreed to pay Rodriquez $200.00 for sitting down and helping him. (N.T. 12/6/94 pp. 88–90).

Monroe took out a handkerchief, placed his money inside the handkerchief and handed it to Rodriquez. After giving her the money, Monroe asked the complainant to wait for them to return whereupon she stated, "go ahead, do the best you can, I will be here, do not worry about it." Monroe took a couple of steps then sat back down, expressing his uncomfortability about having her hold his money. He then asked for his money back and for her to place her money ($50.00 that she took out of the bank and the $40.00 in her pocket) side by side with his money. The defendant also asked for her gold chain but Rodriquez indicated she did not wish to give him her chain. Instead, of pressing her for the gold chain, he asked for her MAC card which she also put inside of the handkerchief. He then put his hand inside of his jacket, placed the handkerchief with the money and card inside and came out with an identical handkerchief. However, the other handkerchief was full of newspaper. (N.T. 12/6/94 pp. 90–92).

Monroe then asked Rodriquez to wait there and she agreed. Prior to leaving the McDonald's he handed the complainant a dollar bill and told her to buy a soda. Meanwhile, he and the couple would go outside[,] get a cab, go to the bus station and come right back. The defendant and the couple left and did not return. Despite what Rodriquez said, Monroe said he had no gun. Allegedly, he acquired an additional $100.00 after the incident as a result of acquiring Rodriquez's MAC card. [Thus, the theft proceeds totalled $190].

(Slip Op., Gordon, J., 10/10/95, pp. 2–8.)

■ On appeal, appellant attacks his sentence on the basis that "it was error to grade the theft in this case as a

misdemeanor of the first degree where the amount in question was under $200 and there was nothing taken from the person of the complainant." [4] (Appellant's brief at 10.)

Appellant was sentenced pursuant to 18 Pa.C.S. § 3903, which provides as follows:

## § 3903. Grading of theft offenses

. . . . .

**(a.1) Felony of the third degree.**—Except as provided in subsection (a), theft constitutes a felony of the third degree if the amount involved exceeds $2,000, or if the property stolen is a firearm, automobile, airplane, motorcycle, motor-boat or other motor-propelled vehicle, or in the case of theft by receiving stolen property, if the receive is in the business of buying or selling stolen property.

**(b) Other grades.**—Theft not within subsection (a) or (a.1) of this section, constitutes a misdemeanor of the first degree, except that if the property was not taken from the person or by threat, or in breach of fiduciary obligation, and:

**4.** The Commonwealth argues appellant automatically waived this issue by failing to include it in his Statement of Matters Complained of on Appeal filed pursuant to Pa.R.A.P.1925(b). Appellant concedes he did not include the claim in his section 1925(b) statement. However, under the facts of this case, such a failure does not preclude our review of appellant's claim and therefore we decline to deem it waived. As we stated in *Commonwealth v. Cortes,* 442 Pa.Super. 258, 260–62, 659 A.2d 573, 574 (1995):

> To accept the Commonwealth's argument that failure to include an issue in a 1925(b) statement automatically results in waiver on appeal would be a return to the "double waiver" concept. This we believe is contrary to the policy embodied in Rule 1410 and, therefore, we refuse the Commonwealth's invitation to breathe new life into "double waiver." Admittedly, no statement of matters complained of on appeal was filed. However, that does not prevent us from addressing the issues raised by Appellant. . . . The lack of the 1925(b) statement does not prevent meaningful appellate review. We see no reason to invite a collateral attack claiming ineffectiveness, which 1410 seeks to eliminate, adding another layer of unnecessary judicial activity and delay.

*Id.* On this basis, we will address appellant's claim.

(1) the amount involved was $50 or more but less than $200 the offense constitutes a misdemeanor of the second degree; or

(2) the amount involved was less than $50 the offense constitutes a misdemeanor of the third degree.

*Id.,* § 3903(a.1)(b)(1)(2).

Since neither party disputes that less than $200 was taken from the victim, the question of whether appellant's crime was a first or second degree misdemeanor turns on whether the money was "taken from the person or by threat...." within the meaning of section 3903(b). If so, the trial court properly graded appellant's offense as a first degree misdemeanor under section 3903(b). If the victim's money was not "taken from the person or by threat", the offense constitutes a second degree misdemeanor under section 3903(b)(1). Appellant argues that under his version of the story, the victim was deceived into voluntarily relinquishing her money. Therefore, since the money was given freely, it was not "taken from the person". On the other hand, the Commonwealth, relying on the victim's version, argues that robbery at gunpoint is clearly sufficient to constitute "tak[ing] from the person" and therefore appellant's offense was properly graded as a first degree misdemeanor.

■ In support of this argument, the Commonwealth claims we must view the evidence and all reasonable inferences drawn therefrom in the light most favorable to the verdict winner. While the Commonwealth's statement of the law is clearly correct, *see e.g., Commonwealth v. Parker,* 387 Pa.Super. 415, 418–20, 564 A.2d 246, 248 (1989), appeal denied, 526 Pa. 632, 584 A.2d 315 (1990), we reject the Commonwealth's assertion that this standard requires us to adopt the victim's version under the facts of this case.

Specifically, this case presents the unusual situation wherein both versions of the story support appellant's theft convictions under 18 Pa.C.S. § 3921(a) and § 3925(a), which provide as follows:

**§ 3921. Theft by unlawful taking or disposition**

(a) **Movable property.**—A person is guilty of theft if he unlawfully takes, or exercises unlawful control over, movable property of another with intent to deprive him thereof.

§ 3925. **Receiving stolen property**

(a) **Offense defined.**—A person is guilty of theft if he intentionally receives, retains, or disposes of movable property of another knowing that it has been stolen, or believing that it has probably been stolen, unless the property is received, retained, or disposed with intent to restore it to the owner.

Despite appellee's contention that the victim's account is more favorable to the Commonwealth as verdict winner, we find the versions are equally favorable, under the facts of this case, because both support appellant's convictions under sections 3921 and 3925. Hence, we must look beyond the usual rule that facts are to be construed in favor of the verdict winner to determine which facts the trial court relied upon in convicting and sentencing appellant. We turn to the trial court Opinion, which provides as follows:

Initially, it can be said that the court adopted the defendant's version of what occurred on the day in question. Thus, we resolved the credibility issue between Monroe and Rodriquez in Monroe's favor.

(Slip Op. at 11.) In light of the trial court's express finding that appellant's version of the events was more credible, we must determine whether the grading of his crime as a first degree misdemeanor was proper according to this version.

■ The specific question at issue thus becomes whether appellant's operation of a "flim flam" constitutes a "tak[ing] from the person" so as to justify the trial court's grading of appellant's offense as a first degree misdemeanor under section 3903(b). While our review indicates that this issue has not been resolved by our decisional law, our consideration of persuasive authority indicates that a theft conducted by operation of a scam does not constitute "tak[ing] from the person".

Initially, our Court has discussed the purpose sought to be achieved by statutes which increase the penalty for thefts

involving property "taken from the person". *Commonwealth v. Williams,* 389 Pa.Super. 489, 567 A.2d 709 (1989), involved an appellant's removal of the victim's wallet from a tote bag which the victim was carrying. While the theft in *Williams* did not involve a scam and therefore is of limited aide to our instant analysis, the Court's discussion of section 3903 is helpful:

> Although theft offenses are graded primarily by the value of the property stolen, several types of theft are graded according to the circumstances of the offense irrespective of the value of the property taken. One of these is a theft of property from the person of another. The Comment to section 223.1(2) of the Model Penal Code, from which section 3903 of the Crimes Code was derived, observes that a substantial number of states, including Pennsylvania, "provide for heightened penalties whenever the theft is from a person." Model Penal Code § 223.1(2), Comment at p. 149 and n. 59. The reason for imposing a higher penalty for such a theft, irrespective of the value of the property taken, is that such a theft involves "special potentialities for physical violence or alarm associated with the taking...." *Id.* at p. 148.

*Id.* at 494–95, 567 A.2d at 713. Thus, according to *Williams* and the Model Penal Code, the increased penalty for thefts from the person contemplated by section 3903 is based upon the "special potentialities for physical violence or alarm associated with the taking." *Id.* Instantly, since appellant's theft, which involved deception and voluntary relinquishment of money by the victim, did not engender "special potentialities for physical violence or alarm", the higher penalty contemplated by section 3903(b) would appear to be inapplicable. This conclusion is further buttressed by a review of analogous cases from other jurisdictions.

*State v. Harrison,* 149 N.J.Super. 220, 373 A.2d 680 (1977), involved a scam and conflicting testimony virtually identical to the case *sub judice.* Following a jury trial, appellant was convicted of larceny from the person under N.J.S.A. 2A:119–1. Appellant appealed to the Superior Court of New Jersey on

the basis that the trial court also should have charged the jury on the lesser included offense of simple larceny, N.J.S.A. 2A:119-3, because appellant's testimony indicated "larceny by trick",[5] rather than larceny from the person. *Id.* at 227-29, 373 A.2d at 684. The Superior Court agreed that appellant's jury should have been charged consistent with his assertion of "larceny by trick", holding as follows:

> [I]f defendant's story were believed, the facts he admitted would not support a conviction of larceny from the person. Larceny from the person is a taking of property from the person of another or from an area within his immediate custody and control which raises a danger of confrontation and involves an invasion of the victim's person and privacy....

*Id.* at 227-29, 373 A.2d at 684. Following its reversal, the Superior Court remanded for a new trial.

Similarly, in *People v. Warner*, 801 P.2d 1187 (Colo.1990), the appellant illegally obtained $52 from a cashier via a series of "short-change transactions." *Id.* at 1191. He subsequently was convicted of theft from the person of another under 18-4-401(5), 8B C.R.S. (1986) and appealed on the basis that his act of short-changing the cashier did not amount to theft from the person of another. Confronting this question of first impression, the Supreme Court of Colorado engaged in a thorough review of its law concerning "theft from the person". Following this review, the Court held:

> We fail to find ... that the "theft from the person" provision, as envisioned by the legislature, covers this theft accomplished by short-change transactions. At no time did [appellant] take money from the cashier's person while she was not looking. Rather, the cashier was aware that she was handing money to [appellant], and it was only by deception that [appellant] was able to short-change her.... [Appellant's] theft lacked the element of danger associated with invading the person of an unaware or unconscious

5. "Larceny by trick" is not a crime specifically designated by New Jersey statute. Rather, the court held that it fell under the crime of simple larceny, N.J.S.A. 2A:119-3. *State v. Harrison*, 149 N.J.Super. 220, 227-29, 373 A.2d 680, 684 (1977).

victim for purposes of stealing something of value. The mere taking of the change from the cashier's hand itself is insufficient to find [appellant] guilty of theft from the person of another.

We therefore hold that theft from the person of another does not encompass a theft accomplished by a series of short-change transactions.

*Id.* at 1192.

We find the rationale of *Williams,* the Model Penal Code (Comment to § 223.1(2)), *Harrison* and *Warner* applicable to the instant case. Accordingly, we find the victim's money was not "taken from [her] person" within the meaning of section 3903 and therefore appellant's conduct did not involve the "special potentialities for physical violence or alarm associated with [such a] taking...." Model Penal Code, § 223.1(2), Comment at p. 148; *see also Williams, supra* at 496–97, 567 A.2d at 713. Therefore, appellant's offense constituted a misdemeanor of the second degree under section 3903(b)(1) and the trial court's imposition of sentence on a first degree misdemeanor was in error.[6]

Based on the foregoing, we vacate the February 22, 1995 judgment of sentence and remand for resentencing pursuant to 18 Pa.C.S. § 1104(2) (relating to sentencing for second degree misdemeanors).

Judgment of sentence vacated and case remanded.

Jurisdiction relinquished.

CAVANAUGH, J., concurs in the result.

---

**6.** The Commonwealth also argues, in a footnote, that even if the victim's money was not taken from her person, appellant is nonetheless chargeable with a first degree misdemeanor because the money was taken "in breach of a fiduciary obligation" within the meaning of section 3903(b). (Appellee's brief at 15, n. 8.) Initially, we are aware of no authority, nor is any offered by the Commonwealth, supporting this novel construction of section 3903. Further, neither version of the facts implies the existence of a fiduciary relationship. Under the victim's version, which the Commonwealth has urged throughout this appeal, the robbery was conducted at gunpoint. Under appellant's version, the victim accompanied appellant in order to collect $50, not because she trusted appellant. Hence, we reject the Commonwealth's argument.